## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

|                          |   |                   |
|--------------------------|---|-------------------|
| UNITED STATES OF AMERICA | : |                   |
|                          | : |                   |
| v.                       | : | No. 2:04-CR-135   |
|                          | : |                   |
| DAVID S. CHASE, MD,      | : |                   |
|      Defendant.          | : |                   |
|                          | : |                   |

### OPINION AND ORDER

The Defendant, David S. Chase, MD, is charged with health care fraud and making false statements in connection with cataract surgery that he recommended and performed.  At the close of the government's case in chief, Dr. Chase moved for a judgment of acquittal on all counts.  For the reasons below, the motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. The Indictment

Dr. Chase is an ophthalmologist who practiced until recently in Burlington, Vermont.  He is charged with 71 counts[1] of false statements and health care fraud in violation of 18 U.S.C. §§

_____

[1] The Indictment, filed on September 16, 2004, charged Dr. Chase with 80 substantive counts as well as one forfeiture count (alleging that certain real property is subject to forfeiture if Dr. Chase is convicted on any of the other counts).  On September 6, 2005, before the beginning of trial, the government dismissed nine counts, leaving 71 counts plus the forfeiture count.  The government filed a redacted version of the Indictment omitting the dismissed counts.  In this opinion, all citations to counts and paragraphs of the Indictment refer to the redacted version.

1

1035 and 1347.  The Indictment alleges that Dr. Chase engaged in a scheme to obtain reimbursement from health care benefit programs ("benefit programs") for performing cataract surgery that was not medically necessary.  It alleges that he recommended, and in some cases performed, cataract surgery for patients who did not actually need surgery.  It alleges that he recorded false diagnoses, test results, and statements in the patients' medical charts, and that he intentionally destroyed or misfiled certain other records, in order to create the impression that surgery was medically necessary.  It alleges that in the cases where surgery was actually performed, Dr. Chase submitted insurance reimbursement claims that falsely certified that the procedures were medically necessary.

The 71 substantive counts are based on Dr. Chase's treatment of 32 former patients.  The Indictment alleges that Dr. Chase recorded false statements and recommended medically unnecessary cataract surgery in connection with all 32 patients.  It states that he actually performed cataract surgery on nine of those patients (the "surgical patients"), while the other 23 patients (the "non-surgical patients") did not undergo surgery.  The counts relating to the surgical patients are 1-13, 18-20, 23-29 (the "surgical counts"), and 70-71, while the counts relating to the non-surgical patients are 14-17, 21-22, and 30-69 (the "non-surgical counts").

2

**B. <u>The government's evidence</u>**

During its case in chief, the government introduced numerous documents into evidence and called more than 60 witnesses.  The 32 patients identified in the Indictment testified regarding the history of their vision complaints and their interactions with Dr. Chase.  Eight of Dr. Chase's former employees testified about various aspects of his practice.  The government called 12 ophthalmologists and two optometrists to testify regarding their examinations of Dr. Chase's patients, as well as the standards for determining the medical necessity of cataract surgery.  The government also called law enforcement and other witnesses who presented evidence about Dr. Chase's billing and surgery practices.  In the following sections, the Court will describe specific pieces of evidence where they are relevant to Dr. Chase's arguments.

## II. <u>LEGAL STANDARD</u>

Fed. R. Crim. P. 29(a) provides that on the defendant's motion, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The issue is whether "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  <u>United States v. Jackson</u>, 335 F.3d 170, 180 (2d Cir. 2003).  In making its determination, the Court must view the evidence in the light most favorable to the government, and draw all reasonable

inferences in its favor.  Id.

Fed. R. Crim. P. 29(b) provides that the court is permitted, but not required, to reserve decision on a motion for judgment of acquittal.  In such a case, the court may "submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict."  Fed. R. Crim. P. 29(b).  The rationale behind this provision is to "permit[] the trial court to balance the defendant's interest in an immediate resolution of the motion against the interest of the government in proceeding to a verdict thereby preserving its right to appeal[.]"  Fed. R. Crim. P. 29 Advisory C'ttee Note to 1994 Amendments.


## III. DISCUSSION

At the close of the government's case in chief, Dr. Chase moved for a judgment of acquittal on all counts.  In his motion, Dr. Chase argues that all of the non-surgical counts must be dismissed for lack of evidence that his allegedly false statements were material, and that the non-surgical Section 1347 counts must be dismissed for lack of evidence that his conduct qualifies as an attempt to execute a fraudulent scheme.  He argues that various counts must be dismissed for lack of evidence of the standards that benefit programs use to determine medical necessity.  He argues that certain allegations regarding specific

4

types of false statements must be struck for lack of evidence that benefit programs take those types of statements into account.  He argues that certain allegations regarding false statements must be struck because the statements are not misleading in context.  He argues that the surgical counts must be dismissed for lack of expert testimony that the surgeries were not medically necessary.  Finally, he argues that several individual counts or allegations must be dismissed for lack of evidence.

**A.** **The governing law**

1. The charged offenses: 18 U.S.C. §§ 1035 and 1347

     Dr. Chase is charged with violating 18 U.S.C. §§ 1035 and 1347, which were enacted as part of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("HIPAA").  Acting out of a concern that "health care fraud drains billions of dollars from public and private payers annually," Congress enacted Sections 1035 and 1347 in order to make "any fraud perpetrated against a public or private payer a federal criminal offense."  United States v. Lucien, 347 F.3d 45, 48 (2d Cir. 2003).

     The false statement counts of the Indictment charge violations of Section 1035, which provides:

          (a) Whoever, in any matter involving a health care benefit
          program, knowingly and willfully--

          (1) falsifies, conceals, or covers up by any trick,

5

scheme, or device a material fact; or
(2) makes any materially false, fictitious, or
fraudulent statements or representations, or makes or
uses any materially false writing or document knowing
the same to contain any materially false, fictitious,
or fraudulent statement or entry, in connection with
the delivery of or payment for health care benefits,
items, or services, shall be fined under this title
or imprisoned not more than 5 years, or both.

(b) As used in this section, the term "health care benefit
program" has the meaning given such term in section 24(b)
of this title.

18 U.S.C. § 1035.  The health care fraud counts charge violations

of Section 1347, which provides:

Whoever knowingly and willfully executes, or attempts to
execute, a scheme or artifice--

(1) to defraud any health care benefit program; or
(2) to obtain, by means of false or fraudulent
pretenses, representations, or promises, any of the
money or property owned by, or under the custody or
control of, any health care benefit program,

in connection with the delivery of or payment for health
care benefits, items, or services, [commits a crime].

18 U.S.C. § 1347.  The term "health care benefit program," as

used in both Sections 1035 and 1347, is defined as

any public or private plan or contract, affecting
commerce, under which any medical benefit, item, or
service is provided to any individual, and includes any
individual or entity who is providing a medical benefit,
item, or service for which payment may be made under the
plan or contract.

18 U.S.C. § 24(b).

Because HIPAA was enacted recently, there are relatively few

cases interpreting Sections 1035 and 1347.  Recognizing this

"paucity of case law," United States v. Hickman, 331 F.3d 439,

6

445 (5th Cir. 2003), courts have often looked to cases interpreting the bank fraud statute, 18 U.S.C. § 1344,[2] for guidance in interpreting Section 1347.  See id. (noting that Section 1347's "language and structure are almost identical to the bank fraud statute"); United States v. Cooper, 283 F. Supp. 2d 1215, 1231 (D. Kan. 2003) (noting that the "health care fraud statute was modeled after the bank fraud statute").  Similarly, because the language of Section 1035 closely tracks the language of the general false statements statute, 18 U.S.C. § 1001,[3] cases

---

[2] Section 1344 provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
>
> > (1) to defraud a financial institution; or
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[3] Section 1001 provides:

> (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
>
> > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
> > (2) makes any materially false, fictitious, or fraudulent statement or representation; or
> > (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

7

interpreting that statute provide a useful basis for interpreting Section 1035.

2. <u>Materiality under Sections 1035 and 1347</u>

Several of Dr. Chase's arguments rely on the element of materiality.  In general, to obtain a conviction for fraud or false statements, the government must prove the defendant engaged in a falsehood with regard to a "material" matter.  A matter is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  <u>Neder v. United States</u>, 527 U.S. 1, 16 (1999); <u>United States v. Gaudin</u>, 515 U.S. 506, 509 (1995).  As an element of the crime, materiality must be found by a jury beyond a reasonable doubt.  <u>Gaudin</u>, 515 U.S. 506, 522-23.

Section 1035 expressly requires the government to prove that the defendant's falsehoods were material.  With regard to Section 1347, although there is no explicit mention of materiality in the statute, it is well established that the closely related mail fraud, wire fraud, and bank fraud statutes contain implied requirements of materiality.  <u>Neder</u>, 527 U.S. at 25 (interpreting 18 U.S.C. §§ 1341, 1343, and 1344).  Noting that materiality is an element of the common-law definition of fraud, the <u>Neder</u> Court held that "we must presume that Congress intended to incorporate

---

[commits a crime].

materiality unless the statute otherwise dictates." <u>Id.</u> at 23. Recognizing that the reasoning of the Court in <u>Neder</u> applies with equal force to Section 1347, courts have uniformly held that materiality is an element of health care fraud under that statute. <u>See, e.g.</u>, <u>United States v. Cooper</u>, 283 F. Supp. 2d 1215, 1232 (D. Kan. 2003) (requiring the government to demonstrate that the defendant engaged in "material, fraudulent representations"); <u>United States v. Lauersen</u>, No. 98 Cr. 1134, 1999 U.S. Dist. LEXIS 12868, *12 (S.D.N.Y. Aug. 20, 1999) (noting that "materiality. . . presumably is an element under the health care fraud statute as well since it shares common language [with the mail fraud statute]"); <u>United States v. Gossman</u>, 135 Fed. Appx. 32, 35 (9th Cir. 2005) (proceeding under the assumption that materiality is an element of Section 1347).

In accordance with the above case law, this Court holds that to obtain a conviction on the Section 1347 counts, the government must prove that the defendant made or caused to be made one or more materially false statements as alleged in that count. Given the express materiality requirement of Section 1035, this means that the government must prove materiality for every count in the Indictment.

**B. Sufficiency of the evidence with regard to the non-surgical counts**

Dr. Chase raises two arguments relating to the non-surgical counts.  First, he argues that he is entitled to a judgment of acquittal on all of the non-surgical counts because the government has failed to establish the element of materiality with respect to those counts.  Second, he argues that he is entitled to a judgment of acquittal on the non-surgical counts charging violations of Section 1347 because his conduct falls short of what the law requires for an execution or attempted execution of a fraudulent scheme.

1. Whether the government has established the materiality of the statements alleged in the non-surgical counts

Dr. Chase argues that he is entitled to a judgment of acquittal on both the Section 1035 and 1347 non-surgical counts because the government has failed to establish the materiality of the recordings he made in the non-surgical patients' charts.  Because he never performed surgery or sought reimbursement on behalf of the non-surgical patients, Dr. Chase argues, those patients' charts never became available for review by benefit programs.  Accordingly, he contends, the statements in the charts cannot be considered material because they were never capable of influencing any decision made by a benefit program.

The government has offered no evidence that any benefit program reviews a patient's charts or makes decisions regarding

10

the notations therein unless and until a claim for reimbursement has been made on behalf of that patient.  Dr. Rosenberg testified that Medicare sometimes conducts reviews of patient records *after* payment has been made, but he stated that it does not look into records of patients on whose behalf no bill has been submitted. The available evidence also indicates that insurance company audits are extraordinarily rare; there is no evidence that Dr. Chase or any of the other doctors who testified had ever been audited.  What is more, there has been no showing that an audit would cover records unconnected with a reimbursement claim.

While not contesting this state of the evidence, the government submits three responses to Dr. Chase's materiality argument.  First, it argues, under both Sections 1035 and 1347, charts need not actually be submitted to or considered by a benefit program for their contents to be material to that program.  It is sufficient, the government suggests, that at the time the statements were placed in the charts, there was a possibility that they might later influence a benefit program's decisionmaking process.  Second, with respect to the Section 1035 counts, the government argues that the charts are material because they are capable of influencing decisionmakers other than benefit programs, such as health care providers.  Third, with respect to the Section 1347 counts, it argues that Section 1347 does not require that the government demonstrate materiality with

11

respect to individual patient charts; it need only demonstrate that material false statements were made as part of the overall scheme.

    a. <u>Whether the charts are material to benefit programs that never had an opportunity to review them</u>

The government's first argument is that the recordings in the non-surgical patients' charts must be considered material because at the time they were made, there was a theoretical possibility that a benefit program might one day become authorized to review them, even though that never actually transpired. The government invites the Court to overlook the fact that the charts were never made available to any benefit program because Dr. Chase never took any action, such as submitting a bill, that would have given the programs authority to review the charts.

The government's sweeping conception of materiality is at odds with the Supreme Court's definition of a material statement as one with "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body *to which it was addressed*." <u>Neder</u>, 527 U.S. at 16 (emphasis added). If a statement merely exists in isolation in a patient's medical chart, never subject to audit or review by a benefit program, it cannot reasonably be described as having been "addressed," or even capable of being addressed, to that program.

The government relies principally on the proposition that

12

proof of actual reliance by the decisionmaker is not necessary to establish materiality: "False statements may be material even though they do not mislead anyone, so long as they have the potential to influence the [decisionmaker's] conduct." United States v. Kwiat, 817 F.2d 440, 445 (7th Cir. 1987); accord United States v. Shapiro, 29 Fed. Appx. 33, 35 (2d Cir. 2002).  This well-established proposition is insufficient to sustain the government's argument, however.  To be sure, a statement may still be material if the decisionmaker disregards it or knows it is false.  United States v. Rogers, 118 F.3d 466, 472 (6th Cir. 1997).  Similarly, a statement can be material even if it was never physically submitted, as long as the statement was subject to audit or review by the decisionmaker.  United States v. Rutgard, 116 F.3d 1270, 1287 (9th Cir. 1997); United States v. Candella, 487 F.2d 1223, 1227 (2d Cir. 1973).  The government, however, would stretch the definition of materiality well beyond the existing case law by asserting that a statement is material even when the likelihood is minimal that the decisionmaker will view it or take it into consideration.

The government's position is not aided by language in some decisions stating that "[t]he materiality of a misstatement depends on the effect that is reasonably anticipated at the time the statement is made, not on how things turn out." Kwiat, 817 F.2d at 445.  In contrast to the present case, the false

13

statement at issue in <u>Kwiat</u> had actually been submitted to the relevant decisionmaker, and it is evident that the court's language refers to the time at which the statement was made *to the decisionmaker*, not the time at which it was physically written down.  The government's interpretation would be illogical; because materiality depends on context, a statement's materiality cannot be determined until the writer has actually taken the necessary steps to address it to a particular decisionmaker.

Perhaps the most striking fact supporting Dr. Chase's position is that the government has failed to cite a single case involving a prosecution for fraud or false statements in which a court found falsehoods to be material even though they were never made available to the relevant decisionmaker.  In the majority of the cases cited by the government, the statement in question had actually been submitted to the decisionmaker.  <u>See</u> <u>United States v. White</u>, 270 F.3d 356, 360-61 (6th Cir. 2001); <u>United States v. Service Deli, Inc.</u>, 151 F.3d 938, 940-41 (9th Cir. 1998); <u>United States v. Gafyczk</u>, 847 F.2d 685, 691 (11th Cir. 1988); <u>Kwiat</u>, 817 F.2d at 444-45; <u>United States v. Goldfine</u>, 538 F.2d 815, 820 (9th Cir. 1976); <u>United States v. Cisneros</u>, 26 F. Supp. 2d 24, 40 (D.D.C. 1998) <u>United States v. Pereira</u>, 463 F. Supp. 481, 483 (E.D.N.Y. 1978).  In the few remaining cases, the statements were not actually submitted to a decisionmaker, but had been entered

in files that were subject to review by the decisionmaker.  <u>See</u>
<u>Rutgard</u>, 116 F.3d at 1287 (medical charts were available for
review subsequent to defendant's billing of Medicare); <u>United</u>
<u>States v. Hooper</u>, 596 F.2d 219, 223 (9th Cir. 1979) (internal
university records were available to government agency under its
audit and inspection authority); <u>Candella</u>, 487 F.2d at 1227 (law
mandated that the files "must be kept available by the City for
audit and inspection by" federal agency).  However, the
government has not pointed to a single case, and the Court is
unaware of any, that holds that statements can be considered
material *before* they are made available for review by the
decisionmaker.

Case law interpreting the related "jurisdiction" requirement
of Section 1001 provides additional support for the notion that a
false statement is only punishable once it becomes available for
the decisionmaker's review.  In <u>Rutgard</u>, which like this case
involved an alleged scheme of fraudulent billing for cataract
surgery, the court made clear that false statements in a doctor's
files only become illegal under Section 1001 once payment is made
by the benefit program and the files become subject to review:
"It is argued that doctors should not be made criminals for
inaccurate note taking.  But the statute speaks to fraudulent
notations.  *They are criminal only when, as here, they prevent*
*review of payments made to a physician by the government*."

15

Rutgard, 116 F.3d at 1287 (emphasis added).  Similarly, in United States v. Lutz, 154 F.3d 581, 586-87 (6th Cir. 1998), the court held that the defendant's false statements on a loan application did not violate Section 1001 at the time that she wrote them or at the time she submitted the application to the lending institution, but they did once the application was submitted to the government.

The principle at issue in Lutz and Rutgard was not materiality, but rather the requirement in Section 1001 that a statement involve a "matter within the jurisdiction of the . . . Government."  18 U.S.C. § 1001(a).  The corresponding provision in Section 1035 provides that the statement must be made in a "matter involving a health care benefit program."  Just as a statement does not fall within the jurisdiction of the government until it becomes available for agency review, a statement cannot be considered to involve a benefit program, and hence it cannot violate Section 1035, until it becomes available for review by that benefit program's decisionmaking process.

For these reasons, the Court cannot accept the government's contention that statements in the non-surgical patients' charts were material to the decisionmaking process of the health care benefit programs that were allegedly victimized by Dr. Chase's scheme.  Regardless of whether he made false statements in patient charts, those statements were not material under Sections

16

1035 or 1347 unless and until Dr. Chase took action that would make the charts available for review by a relevant decisionmaker, and there is no evidence that he took any such action with respect to the charts of the non-surgical patients.

    b. <u>Whether the charts are material under Section 1035 to entities other than benefit programs</u>

    The government also argues that in determining the materiality of the false statements alleged in the Section 1035 counts, the Court must take into account not only benefit programs, but also other potential decisionmakers in the health care system.  It argues that Dr. Chase's statements had the potential to influence decisionmakers within Dr. Chase's own practice, such as the members of his internal peer review committee, outside accreditation organizations, or other doctors who might review the charts in question.  For this reason, the government argues, the statements are material regardless of whether they were capable of influencing any other benefit programs.

    Noting that the government's argument represents a different theory of materiality from what is described in the Indictment, Dr. Chase responds that the government has engaged in an impermissible constructive amendment of the Indictment.  The Fifth Amendment requires that an indictment "give[] notice of the core of criminality to be proven at trial."  <u>United States v. Danielson</u>, 199 F.3d 666, 669 (2d Cir. 1999).  "When the trial

17

evidence or the jury charge operates to broaden the possible
bases for conviction from that which appeared in the indictment,
the indictment has been constructively amended." United States
v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005). "To prevail on a
constructive amendment claim, a defendant must demonstrate that .
. . the proof at trial . . . so altered an essential element of
the charge that, upon review, it is uncertain whether the
defendant was convicted of conduct that was the subject of the
grand jury's indictment." United States v. Salmonese, 352 F.3d
608, 620 (2d Cir. 2003). Constructive amendment is a per se
violation of a defendant's Fifth Amendment rights. Milstein, 401
F.3d at 65.

Since materiality is an essential element of the offenses
charged in the Indictment, the constructive amendment doctrine
precludes the government from relying upon evidence of
materiality that was not alleged in the Indictment. Yet there is
nothing in the Indictment to put Dr. Chase on notice that the
government intended to charge him for making statements that were
directed to or considered by any entity other than a benefit
program. On the contrary, the entire thrust of the Indictment is
based on the theory that Dr. Chase engaged in a scheme to make
false statements that would mislead benefit programs in order to
obtain money from those benefit programs. See, e.g., Indictment
¶ 15 "alleging that Dr. Chase "submitted and caused to be

18

submitted claims for reimbursement of medical services . . . to
federally funded health care benefit programs, [listing
examples], and private health care benefit programs, [listing
examples]"); id. ¶ 21 (alleging that Dr. Chase engaged in a
scheme "to defraud health care benefit programs and to obtain
money and property owned by and under the custody and control of
health care benefit programs"); id. ¶ 29 (alleging that Dr. Chase
submitted "claims to health care benfit programs for
reimbursement of medical services . . . that were not medically
necessary"); id. ¶ 48 (alleging that Dr. Chase "regularly
submitted claims to health care benefit programs using these
fraudulent test results to justify secondary cataract surgery").
The Indictment is devoid of any indication that the alleged false
statements were directed to or considered by other entities, such
as other doctors or individuals in Dr. Chase's practice.  It is
too late for the government to propose, at this stage of the
case, that the Court rewrite the Indictment to allow the jury to
consider the impact of the statements on other individuals who
are not mentioned in the Indictment.

     The situation presented in this case is similar to that in
Stirone v. United States, 361 U.S. 212 (1960), which involved a
prosecution under the Hobbs Act.  The indictment in Stirone had
charged that interstate commerce was affected because a concrete
manufacturer had imported sand from out of state.  At trial,

19

however, the trial court instructed the jury that it could rely instead on evidence that the concrete had been used to build a steel mill that produced articles for use in interstate commerce. The Supreme Court held that constructive amendment had occurred. Stirone, 361 U.S. at 218-19.  In this case, while the essential element is materiality rather than interstate commerce, the government likewise seeks to rely on a different theory and on different evidence than what is charged in the Indictment.  The evidence the government now seeks to use is outside of the "core of criminality," Danielson, 199 F.3d at 669, of which Dr. Chase received notice in the Indictment.

The Court expresses no opinion as to whether, as a general matter, materiality under Sections 1035 and 1347 may be established by considering individuals that are not victims of the alleged fraud.  The government's attempt to turn to such a theory at this stage of the case, however, represents an impermissible constructive amendment of the Indictment, and it cannot establish materiality for the non-surgical counts on this ground.

c. Whether Section 1347 requires materiality to be established for each patient chart

The government also argues that the materiality requirement of Section 1347 can be satisfied without a showing that every patient chart contains materially false statements.  While conceding that Section 1347 incorporates a materiality

20

requirement, the government argues that the requirement applies only to the first element of the offense, which is the existence of a scheme to defraud, and not to the second element, which is the attempted or actual execution of the scheme.  Accordingly, the government argues, once it has established the existence of an overall scheme based on materially false statements, it need not prove the materiality of every statement that represents an attempt to execute the scheme.

The government's attempt to confine the materiality requirement to the first element of the offense is unsupported by the law.  It is true, as the government points out, that in the customary jury instructions for the offense of bank fraud under 18 U.S.C. § 1344, the word "materially" only appears in the first element.  The three elements are:

> First, that there was a scheme to defraud a bank (or a scheme to obtain money or funds owned or under the custody or control of a bank by means of *materially* false or fraudulent pretenses, representations or promises) as charge in the indictment;
>
> Second, that the defendant executed or attempted to execute the scheme with the intent to defraud the bank; and
>
> Third, that at the time of the execution of the scheme, the bank had its deposits insured by the Federal Deposit Insurance Corporation.

2 L. Sand, et al., Modern Federal Jury Instructions 44-9 (2004) (emphasis added).

However, the second element refers directly to the "scheme"

defined in the first element; as such, the second element
implicitly incorporates the requirement of materiality.  The case
law makes this clear, holding that not only the scheme but also
its execution must involve material statements.  See, e.g.,
Neder, 527 U.S. at 20 (holding that the federal fraud statutes
require that "a scheme to defraud *employ* material falsehoods")
(emphasis added); Cooper, 283 F. Supp. 2d at 1232 (holding that
under Section 1347, "the government must prove that the
defendants knowingly and willfully *executed or attempted to*
*execute a scheme* to defraud . . . *by means of material,*
*fraudulent representations*.") (emphasis added).  Indeed, if a
fraudulent scheme is defined as one based on materially false
representations, it would be illogical to argue that an
individual could execute or attempt to execute such a scheme by
making immaterial statements.

For this reason, even if the government can establish that
Dr. Chase engaged in an overarching scheme to defraud benefit
programs, it cannot obtain a conviction on any individual Section
1347 count unless it provides evidence sufficient to establish
the materiality of the statements alleged in that particular
count.

Because, as discussed above, the government has not
demonstrated the materiality of the statements alleged in any of
the non-surgical counts, Dr. Chase is entitled to a judgment of

acquittal on all such counts.

2. <u>Sufficiency of the evidence regarding attempted or actual
execution of a scheme to defraud under 18 U.S.C. § 1347</u>

Dr. Chase argues that he is entitled to a judgment of
acquittal on all of the non-surgical counts that charge
violations of 18 U.S.C. § 1347.  He argues that because he never
performed surgery or submitted reimbursement claims on the non-
surgical patients, his actions fell short of the conduct required
for an execution or attempted execution of a fraudulent scheme
under Section 1347.  As discussed below, even if Dr. Chase were
not entitled to a judgment of acquittal on the non-surgical
counts because of the government's failure to establish
materiality, he would be entitled to judgment on this ground.

Section 1347 "punishes executions or attempted executions of
schemes to defraud, and not simply acts in furtherance of the
scheme." <u>United States v. Hickman</u>, 331 F.3d 439, 446 (5th Cir.
2003).  While conceding that Dr. Chase did not actually execute a
scheme to defraud with respect to the non-surgical patients, the
government argues that he attempted to execute such a scheme by
recording false statements in the non-surgical patients' charts
and recommending that they undergo surgery that was not medically
necessary.

To obtain a conviction for an attempted crime, "the
government must prove that the defendant had the intent to commit
the crime and engaged in conduct amounting to a substantial step

23